UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| Richard P. Conrad Jr., *et al.*, | : | |
| | : | Case No. 1:25-cv-00600 |
| Plaintiff, | : | |
| | : | Judge Christopher A. Boyko |
| v. | : | |
| | : | |
| Madison Local School District Board of | : | |
| Education, *et. al.*, | : | |
| | : | |
| Defendants. | : | |

PLAINTIFF'S APPLICATION FOR PRELIMINARY INJUNCTION

Pursuant to Civil Rule 65, Plaintiff Conrad hereby applies for a preliminary injunction enjoining Defendants from punishing C.C. any further for his free speech, specifically enjoining the Defendants from excluding C.C. from school trips and other items available to all other students. This potential harm is imminent and irreparable. (*See* Aff. Conrad, attached below.) The reasons supporting this Motion are set forth in the Memorandum below. Plaintiff also asks the Court to set Plaintiff's application for preliminary injunction for hearing at the earliest possible time.

MEMORANDUM

I.    STATEMENT OF FACTS

1.    Plaintiff hereby incorporates his Complaint and all affidavits and exhibits.

2.    On or around November 25, 2024, Plaintiff's child C.C. wore a t-shirt to school that said "Let's Go Brandon." (Compl. Ex. A.)  C.C. wore a flannel shirt over top

of the t-shirt that day.

3.      The phrase "Let's Go Brandon" communicates criticism of certain media outlets for a well-documented pattern of misreporting facts in a politically biased fashion. In this particular incident, a large crowd at a NASCAR race was heard shouting a profane disdain for then-President Joseph R. Biden, chanting "F*** Joe Biden." The reporter on the scene reported the chant as "Let's go Brandon," as if the chant was actually praise for the winner of the race, whose first name was Brandon. From that point forward, that moment was perceived as a microcosm of a larger problem, and "Lets Go Brandon" became a popular expression of certain people's opinion toward the media and American politics.

4.      Before school starts, students at this school have "Ram Time." During Ram Time, C.C. was wearing his t-shirt in the hallway.

5.      C.C. had worn a shirt with this content many time in the previous school year (i.e., 2023-2024). No person expressed any negativity toward C.C. or his shirt that previous year.

6.      During this school year (2024-2025) no person expressed any negativity toward C.C. or his shirt, except Teacher Krista Ferini.

7.      Ferini is a registered Democrat in Crawford County, Ohio.

8.      Ferini saw the t-shirt and said to C.C., "button that up, I know what that means."

9.      C.C. followed Ferini's instruction and buttoned up his flannel shirt, so that

the content of his speech and C.C.'s expression of his opinions could not be seen.

10.     Later in the day, in third-period, C.C. had band practice. The room was hot and does not have air conditioning. To cool off, C.C. took off his flannel.

11.     C.C.'s first class after lunch is Ferini's class. C.C. and other students are allowed to leave their class materials in Ferini's classroom while they are at lunch. C.C. went into Ferini's classroom for this purpose, which is typical for him.

12.     No person expressed any negativity toward C.C. or the content of C.C.'s shirt, except Ferini.

13.     Ferini saw C.C. in the classroom and the words on his shirt.

14.     Ferini told C.C. she was "writing him up" to punish him for the content on his shirt.

15.     C.C. was given a "pink slip" which is a referral to the school Principal Andrew Keeple, for discipline.

16.     C.C. went to lunch as normal.

17.     During Ferini's class, C.C. was called to the Principal Keeple's office.

18.     Keeple demanded that C.C. wear his flannel the rest of the school day and instructed C.C. to never again wear an item communicating the content of this speech.

19.     Sometime in or around late January 2025, C.C. wore the t-shirt again.

20.     Again, no person expressed negativity toward C.C. or the content of his shirt . . . again, except Ferini.

21.     During the time in-between fifth and sixth period, Ferini stopped C.C.

while he was walking into another teacher's math class.

22.     Ferini said, "Hey [C.C.], come here" waiving C.C. to come to her. Ferini was standing a few feet outside the class, waiting for C.C. Ferini asked C.C. "do you like offending people?"

23.     C.C. responded with "that's not my problem, nobody has to read my shirt."

24.     Ferini gave C.C. a dirty look and walked away.

25.     During that school day, Principle Andrew Keeple called C.C.'s father, Plaintiff Conrad.

26.     Keeple told Conrad that there was another incident of C.C. violating the dress policy. If it was to continue, C.C. would be further disciplined.

27.     Conrad asked the Principle for an in-person meeting, wanting to discuss what the problem was with C.C. personal expression.

28.     The Principle said he would be available until about 3:00 p.m. that day.

29.     Conrad and Conrad's own father went to the school together to discuss the situation.

30.     Keeple sat with both men. Keeple said that "Let's Go Brandon" is "code" for a vulgar expression.

31.     Conrad told Keeple that Conrad did not interpret it that way.

32.     Conrad ultimately told Keeple that he would not instruct C.C. to refrain from wearing clothing communicating this content.

33.     On March 24, 2025, C.C. wore the same shirt to school again.

34.     No person expressed any negativity toward C.C. or the shirt.

35.     While in Ferini's class, C.C. could see that Ferini was furiously writing an email about him (C.C. could see the computer screen).

36.     Two days later, C.C. was called to the Principle's office again.

37.     C.C. and the Principle spoke alone in the Principle's office.

38.     This time, the Principle did not speak much. He only said (something to the effect of) "I will need you to sign this to let you know that you have after-school detention. You know why you're down here."

39.     On at least two more occasions in March of 2025, District officials punished C.C. for the content of his "Let's Go Brandon" t-shirt.

40.     C.C. would like to express his personal opinions, including wearing t-shirts with the content of the t-shirt he was punished for wearing. However, C.C.'s free speech is punished and chilled by the District's punishment.

41.     The District's officials allow many other different expressions and speech on student's clothing, at school, including political speech.

42.     The email in the Complaint Exhibit B was sent to Plaintiff Conrad, shortly after Keeple punished his child C.C. for the content of his speech. The email says,

> [t]his letter is to inform you that your child has been issued a [*sic*] after school detention due to the disciplinary reasons listed below. The following infraction was committed: REPEATED VIOLATIONS OF SCOC L1, which violates the school policy of LEVEL 1-RULE 14.

(Compl. Ex. B.)

43.     Plaintiff believes "SCOC" stands for "Student Code of Conduct." Plaintiff was unable to determine what "L1" means.

44.     LEVEL 1-RULE 14 says, "14. Repeated violation of the student conduct code." (*See* Compl. Ex. C at p. 43.)

45.     The Madison Local School District Board of Education promulgated the Student Code of Conduct.

46.     Teacher Ferini and Principle Keeple exercised discretion granted to them by the District's Board of Education, in accord with the District's "Secondary Grades 6-12 Parent & Student Handbook 2024-2025" which includes the Student Code of Conduct. (*See* Compl. Ex. C.)

47.     The actions of Ferini and Keeple were consistent with the policies and customs of the Madison Local School District.

48.     The policies and customs of the schools within the Madison Local School District are set by the Board of Education through its Student handbook, which is offered in Plaintiff's Complaint at Exhibit C.

49.     This Code of Conduct provides no clarity on the rights of students to free speech. Thus, the Madison Local School District's Student Code of Conduct is unconstitutionally vague because it grants broad discretion to individual government employees, who may exercise that discretion in an arbitrary, capricious, and discriminatory manner, without recourse or accountability.

50.     The Madison Local School District Board of Education, through its Student

- 6 -

Code of Conduct, even when applied to non-disruptive speech (such as C.C.'s speech) allows for government officials to engage in content-based restrictions at their discretion.

51. Such content-based restrictions do not further a compelling government interest, do not advance a pedagogical purpose, are not narrowly tailored, do not allow for alternative channels of speech, and are not the least restrictive means of speech regulation available.

52. Since this case was filed, the District continues to punish C.C. for wearing his shirt, giving him further detentions and suspensions several more times, for the same t-shirt. The District punished C.C.'s brother for the same shirt. The District indicated to C.C.'s father Richard Conrad that C.C. will not be allowed to participate in school trips to Cedar Point and the Mansfield Reformatory, due to his exercise of Free Speech. (*See* Aff. Conrad, attached below.)

II.    LAW AND ANALYSIS

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Couns., Inc.*, 555 U.S. 7, 20, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008); *see also Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 399 (6th Cir. 1997).

1.    <u>Irreparable Injury and No Adequate Remedy at Law</u>.

Plaintiff will likely suffer injury if Defendants are not restrained from punishing

C.C. any further. The punishments the Defendants already levied are wrong and unconstitutional and intended to chill free speech.

Now, Defendants threaten to impose permanent stigma and punishment on C.C. by refusing to allow him to participate in events that the other students are all allowed to participate in. In particular, the Defendants informed Plaintiff that C.C. will be forbidden from going on school trips to Cedar Point and Mansfield Reformatory.

All this, for no reason other than C.C.'s exercise of this right to Free Speech. These are one-in-a-lifetime opportunities for C.C. and there is no legal remedy for deprivation of these unique opportunities or the stigma C.C. will face from his peers for missing these events.

    2.    <u>Substantial Likelihood of Success on the Merits and Public Interest Supports Approval of Plaintiff's Preliminary Injunction Application</u>.

    a.    Violation of C.C.'s Free Speech Rights

The public interest supports the issuance of an injunction, enjoining the Defendants from punishing C.C. any further, for the same reason Plaintiffs are likely to prevail in this case: because public policy supports free expression.

Local governing bodies, such as school districts, can be sued directly under § 1983 for monetary, declaratory, or injunctive relief. *Monell v. Department of Social Services*, 403 U.S. 658, 690 (1978). A local government, such as a school district, may be liable for deprivation of a constitutional right under color of law, "when execution of edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as

an entity is responsible under § 1983." *Id*. Meanwhile, Teacher Ferini and Principle Keeple directly violated C.C.'s First Amendment right to Free Speech.

The First Amendment to the Constitution of the United States includes a clause granting freedom of speech to all citizens. It prohibits censorship or punishment for protected expression. It is incorporated and made applicable to the states by the Fourteenth Amendment to the United States Constitution. The Ohio Constitution contains a similar section. "Every citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of the right; and no law shall be passed to restrain or abridge the liberty of speech." Ohio Const., art. I, § 11.

Political speech is the most protected type of speech. The United States has "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-280, 84 S.Ct. 710 (1964) citing: *Terminiello v. Chicago*, 337 U. S. 1, 337 U. S. 4; *De Jonge v. Oregon*, 299 U. S. 353 (1937).

Viewpoint-based restrictions on speech in a public forum are presumptively unconstitutional and are subject to strict scrutiny. *Bible Believers v. Wayne Cty., Mich.*, 805 F.3d 228, 248 (6th Cir. 2015) (quoting *Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 358, 129 S. Ct. 1093, 172 L. Ed. 2d 770 (2009).

Non-disruptive speech is protected speech under the First Amendment and Article I, Section 11. *Tinker v. Des Moines Independent Community School District*, 393 U.S.

503, 509, 89 S. Ct. 733 (1969). In *Tinker* the U.S. Supreme Court found that students' speech was protected, where students wore black arm bands in school, as a protest against government actions and policy regarding the United States' involvement in the War in Vietnam. The Court also held that the students did not lose their First Amendment rights to freedom of speech when they stepped onto school property. In order to justify the suppression of speech, the school officials must be able to prove that the conduct in question would "materially and substantially interfere" with the operation of the school. *Id.* at 513.

Here, like the students in *Tinker,* C.C.'s t-shirt constitutes speech that is protected under both the Ohio and United States Constitutions. The messages C.C. expressed are exclusively C.C.'s private expression and are not school-sponsored speech. The District allows many different kinds of personal speech on student's clothing. However, Defendants singled out C.C.'s expression and punished C.C. for it. Defendants' unequal treatment of C.C.'s expression is also a content-based restriction of her speech in an otherwise open forum.

Here, Defendants' policy and practice has no compelling or legitimate reason that would justify their censorship of the message that C.C. seeks to express. Defendants' policy and practice are not the least restrictive means of achieving any compelling interest they may allege. Defendants' policy and practice are not reasonably related to any legitimate pedagogical concerns. Censoring students' protected speech *per se* is not and cannot be a legitimate pedagogical concern.

Here, because Ferini and Keeple punished C.C. for the content of his speech, they violated C.C.'s Free Speech rights under color of law and are liable pursuant to § 1983. Because the District's policies and customs unconstitutionally deprived and continue to deprive students of protection of their Free Speech rights, the District is liable pursuant to § 1983.

        b.     Heckler's Veto

When Ferini and the Principle harassed and punished C.C. for the content communicated on his shirt, they were not doing so in reaction or anticipation of a disruption to the school. He wore the shirt before with no disruption. Rather, they were standing against the content of C.C.'s speech and the principle of demonstration of that content itself. *Tinker* at fn. 3. Ferini and Keeple simply felt the school is no place for demonstrations of certain personal opinions. *Id.*

However, even if people at the school were truly offended by the content of C.C.'s expression, "[the 'substantial disruption'] burden cannot be met if school officials are driven by 'a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint.'" *J.S. v. Blue Mt. Sch. Dist.,* 650 F.3d 915, 926 (3rd Cir. 2009) quoting *Tinker,* 393 U.S., at 509; *see also Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*, 594 U.S. 180, 141 S. Ct. 2038, 2045, 210 L.Ed.2d 403 (2021).

In another case, the court held that the school overstepped its constitutional bounds when it suspended a student for making "lewd" comments about the school's athletic director in an e-mail the student wrote at home and circulated to e-mail accounts

of several classmates. *Killion v. Franklin Reg'l Sch. Dist.*, 136 F.Supp. 2d 446 (W.D. Penn. 2001).

In *J.S.* the Court found the school went beyond its constitutional boundaries. A student "was suspended from school for speech that indisputably caused no substantial disruption in school and that could not reasonably have led school officials to forecast substantial disruption in school." *J.S.*, 650 F.3d at 920.

In *J.S.*, two students created an online parody profile of their teacher, at J.S.'s home, on a computer belonging to J.S.'s parents. *Id.* 920. "The profile did not identify [the teacher] by name, school, or location, though it did contain his official photograph from the School District's website. The profile was presented as a self-portrayal of a bisexual Alabama middle school principal named 'M-Hoe.' The profile contained crude content and vulgar language, ranging from nonsense and juvenile humor to profanity and shameful personal attacks aimed at the principal and his family." *Id.* at 920.

The teacher "told J.S. and K.L. that he was upset and angry, and threatened the children and their families with legal action." *Id.* at 922. The school in *J.S.* asserted that the profile disrupted school in the following ways.

> There were general "rumblings" in the school regarding the profile. More specifically, on Tuesday, March 20, [the teacher] was approached by two teachers who informed him that students were discussing the profile in class. [Another teacher] experienced a disruption in his class when six or seven students were talking and discussing the profile; [that teacher] had to tell the students to stop talking three times, and raised his voice on the third occasion. The exchange lasted about five or six minutes. Nunemacher also testified that he heard two students talking about the profile in his class on another day, but they stopped when he told them to get back to work. [The

teacher] admitted that the talking in class was not a unique incident and that he had to tell his students to stop talking about various topics about once a week. Another teacher . . . testified that she was approached by a group of eighth grade girls at the end of her Skills for Adolescents course to report the profile. [This second teacher] said this did not disrupt her class because the girls spoke with her during the portion of the class when students were permitted to work independently.

The School District also alleged disruption to [the school counselor's] job activities. [The Counselor] canceled a small number of student counseling appointments to supervise student testing on the morning that [the teacher] met with J.S., K.L., and their parents. The Counselor was originally scheduled to supervise the student testing, but was asked by [the teacher] to sit in on the meetings, so [a teacher] filled in for [another teacher]. This substitution lasted about twenty-five to thirty minutes. There is no evidence that [the Counselor] was unable to reschedule the canceled student appointments, and the students who were to meet with her remained in their regular classes.

*Id.* at 922-23.

The *J.S.* Court found these facts did not pass the muster of the Substantial Disruption Test.

Here, Defendants' policy and practice also impose an unconstitutional heckler's veto because they permit the restriction of protected student expression merely because the school officials deem the student's expression offensive. Causing offense does equate to substantial disruption.

      c.    District Policy Imposes Unconstitutional Prior Restraints, because it Grants Overly-Broad, Arbitrary, Discriminatory, and Capricious Discretion.

Prior restraints on speech may not delegate overly broad discretion to government decision-makers, may not allow for content-based restrictions, must further a compelling

government interest, must be narrowly tailored, and must be the least restrictive means available.

Defendant Madison School District's policy, custom, and practice impose an unconstitutional prior restraint because they vest the school officials with unbridled discretion to permit or deny student expression, outside of the school itself. This permits content and viewpoint-based enforcement of the policies.

Defendants' policy and practice give unbridled discretion to school officials by permitting them to forbid messages that they personally deem to be offensive and allow messages they personally do not deem offensive.

Here, Defendants' policy and practice is overly broad because they restrict student speech that does not and will not materially disrupt the educational process. This overbreadth chills the speech of students who wish to levy criticism of public officials.

d.    Count Two: Due Process Violation

The Due Process Clause of the Fourteenth Amendment prohibits the government from censoring speech pursuant to vague standards that grant government officials unbridled discretion.

A local government, such as a school district, may be liable for deprivation of a constitutional right under color of law, "when execution of a edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell v. Department of Social Services,* 436 U.S. 658, 694 (1978).

Under the Board's policies and customs, students of common intelligence must

guess as to whether their expression will be deemed offensive, and thus, subject to censorship and punishment.

Defendants' policy and practice of punishing students for criticizing public officials or making statements as to their political preferences, are vague and allow for unbridled discretion in determining which student speech is permissible.

Due to the Defendants' actions, Plaintiff was harmed because C.C. was deprived of constitutional rights pursuant to the Fourteenth Amendment to the United States Constitution.

2.      <u>Injunction Poses No Harm to Defendants</u>.

The harm faced by Plaintiff outweighs the harm that would be sustained by Defendants if a preliminary injunction were granted. Here, C.C. is being punished solely and completely for the content of his free speech. There are no allegations that C.C. would disrupt the class trips or pose any other sort of harm.

3.      <u>No Bond Should Be Required</u>.

Because there is no risk of harm to Defendants, no bond should be required by Plaintiffs to protect C.C.'s free speech rights.

CONCLUSION

For the reasons set forth above, the Court should issue an order enjoining Defendants from punishing C.C. any further for his free speech, which would specifically include excluding him from school trips and other items available to all other students.

May 7, 2025                                        Respectfully Submitted,

/s/ Joshua J. Brown
Joshua J. Brown  (0089836)
Josh Brown Law LLC.
1554 Polaris Parkway, Suite 325
Columbus, OH 43240
P: (614) 383-8886
josh@joshbrownesq.com
Attorney for Plaintiffs

CERTIFICATE OF SERVICE

I certify that on May 7, 2025, a copy of the preceding PLAINTIFF'S MOTION FOR

PRELIMINARY INJUNCTION was served by email in accordance with Fed.R.Civ.P.

5(b)(2)(E) delivery to the following:

Molly E. Davis (0097484)
Reminger Co. LPA
One Seagate, Suite 1600
Toledo, OH 43604
(419) 354-1311
medavis@reminger.com
Attorney for Defendants

/s/ Joshua J. Brown
Joshua J. Brown (0089836)

- 16 -