# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| RICHARD P. CONRAD, JR., individually as parent and natural guardian of his minor child "C.C", <br><br> Plaintiffs, <br><br> v. <br><br> MADISON LOCAL SCHOOL DISTRICT, et al., <br><br> Defendants. | Case No. 1:25-cv- 00600 <br><br> Judge Christopher A. Boyko <br><br> **DEFENDANTS' BRIEF IN OPPOSITION TO THE APPLICATION FOR PRELIMINARY INJUNCTION** |

Defendants are a middle school, a teacher, and administrators. Plaintiff C.C. repeatedly wore a shirt containing the slogan "Lets Go Brandon!" to class at Defendants' school. Everyone—including a court of this Circuit and Plaintiffs themselves—understands that this is a euphemism for the vulgarity "FUCK JOE BIDEN." It is well settled schools may restrict vulgar speech, including euphemisms exactly like this. Plaintiff C.C. was told to stop wearing the shirt because it violated the school's vulgarity policy. He refused, and he was punished in accordance with school policy for that refusal. The instant filing is nothing more than a temper tantrum. It is certainly not a viable application for injunctive relief. Plaintiffs' application ignores key law and his own factual record. It should be DENIED and Plaintiffs should be cautioned against such incomplete filings in the future.

I. **RELEVANT FACTUAL BACKGROUND**

The events that led to the filing of this lawsuit began back in November of 2024. (Complaint, at ¶¶12, 18-28). Plaintiff, a student at Defendants' middle school, wore a t-shirt to class which had "Let's go Brandon!" on the front. *Id*. The meaning of the phrase "Let's go

1

Brandon!" slogan is decisively established by the pleadings – it stands for "FUCK JOE BIDEN!" *Id*. at ¶13.

On November 25, 2024, Plaintiff wore the t-shirt to school. A teacher, Krista Ferini, observed the shirt and instructed Plaintiff to cover the profane slogan by buttoning up a flannel shirt he wore over the t-shirt. *Id*., at ¶19. Later that same day, Plaintiff removed the flannel, again exposing the slogan, despite his teacher's clear instructions. As a result, Plaintiff was "written up." *Id*., at ¶¶24-25.

Plaintiff wore the shirt again in January 2025. (Complaint, at ¶¶29-36). That day, Plaintiff – *and his father* – were given a clear warning by the Principal that Plaintiff would continue to receive discipline if he continued to wear the shirt. *Id*. With full knowledge of the consequences, Plaintiff wore the shirt again in February 2025 (Doc. 1-1), and three total occasions in March 2025 (Doc. 8, at ¶¶33-38, 39). He was disciplined each time. Despite clear instructions from his teacher and the Principal that the shirt constituted a dress code violation, Plaintiff intentionally disobeyed their instructions not to wear the shirt to school and was disciplined accordingly.

Plaintiff was disciplined for violating the School's code of conduct (Docs. 1-1, 1-2, 1-4), which is set forth in the Secondary Grades 6-12 Parent & Student Handbook 2024-2025 (Doc. 1-3). Therein, the Handbook unambiguously provides that a student may not wear clothing that contains "inappropriate printings or designs, including but not limited to tobacco, drugs, or alcohol. Clothing with obscene, violent or suggestive language or images." (Doc. 1-3, at 37). If a student violates this, or any, provision of the dress code, they are subject to discipline which is also clearly set forth within the Handbook. *Id*. at 42-44. Finally, the Handbook clearly states that students who continuously violate the school's rules may lose the privilege of attending field trips. *Id*. at 19.

Plaintiff is not attending the Cedar Point trip[1] with his class for two reasons: (1) repeated violations of the school's code of conduct; and (2) because he did not turn in a permission slip or payment prior to the April 17th deadline. *See* Exhibit A. Decisions have consequences, consequences which were clearly laid out to Plaintiff and his father prior to the start of the school year, and again in meetings with the Principal throughout the school year. Plaintiff cannot now claim shock, surprise, or "immediate harm" by the school's actions <u>six months</u> after the discussion about his profane t-shirt began. For this reason, and more, he is not entitled to injunctive relief.

**II.    LAW AND ANALYSIS**

Here today, the Court is primarily tasked with determining whether Plaintiff suffers "immediate and irreparable harm," without his requested relief and the likelihood that he will succeed on the merits of his First and Fourteen Amendment claims. For the reasons set forth herein, Plaintiff cannot support either factor, and denial of his requested relief is warranted as a matter of law.

"Four factors determine when a court should grant a preliminary injunction: (1) whether the party moving for the injunction is facing <u>*immediate, irreparable harm*</u>, (2) the likelihood that the movant will succeed on the merits, (3) the balance of the equities, and (4) the public interest." *D.T. v. Sumner Cty. Sch.*, 942 F.3d 324, 326 (6th Cir. 2019) (emphasis added).

A court conducts this inquiry "as a balancing test" weighing "the strength of the four factors against one another." *Sumner Cnty. Schs.*, 942 F.3d at 326. That practice comes with two caveats relevant to First Amendment cases. First, the presence of immediate irreparable injury is an "indispensable" factor. *Id.* at 327. "If the plaintiff isn't facing imminent and irreparable injury,

---

[1]. The Mansfield Reformatory field trip occurred on May 9, 2025. Any arguments on this point are moot.

3

there's no need to grant relief *now* as opposed to at the end of the lawsuit." *Id*. (emphasis in original). However, and second, any "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1988)). Thus, "the likelihood of success on the merits often will be the determinative factor." *Id*.

      **A.    Plaintiff cannot demonstrate a strong likelihood of success on the merits of his First Amendment Claim.**

Right from the start, Defendants bring to the Court's attention a case – *involving an identical fact pattern* – which is currently up on appeal to the Sixth District Court of Appeals. *See D.A. et al. v. Tri County Area Schools, et al*., Docket No. 24-1769. The matter originated in a sister Court in the Western District of Michigan. There, two children in the same family, enrolled in the Tri County Area School District, were disciplined for wearing a "Let's Go Brandon!" shirt to school. *See D.A. v. Tri Cnty. Area Sch*., 746 F. Supp. 447 (W.D. Mich. 2024) (a copy of the decision is included herewith). The parents sued, alleging infringement of the siblings' First and Fourteenth Amendment rights. *See generally*, *id*. After a thorough review of the facts and applicable law, the Court granted Defendants Motion for Summary Judgment, concluding that the school could regulate wearing of "Let's go Brandon!" apparel because it reasonably interpreted the phrase as having a profane meaning. *Id*., at 461. Telling that Plaintiff omitted the opinion from his briefing – the opinion is thorough, well-reasoned, and smothers each of his arguments.

It is well-settled that the First Amendment prohibits the government from "abridging the freedom of speech." U.S. CONST. amend. I. However, freedom of speech is never unlimited. The Supreme Court held that speech, whether expressed orally, in writing, or symbolically by conduct, "is subject to reasonable time, place, or manner restrictions." *Clark v. Cmty. For Creative Non-Violence*, 468 U.S. 288, 293 (1984). "The schoolhouse is one such restriction." *Kutchinski as*

4

*next friend to H.K. v. Freeland Cmty. Sch. Dist.*, 69 F.4th 350, 356 (6th Cir. 2023). While students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," their First Amendment rights are not coextensive with the rights of adults in other settings. *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969); *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986). Because of this, student's free speech rights apply "in light of the special characteristics of the school environment." *Tinker*, 393 U.S. at 506.

> The Supreme Court outlined four categories of student speech that schools may regulate:
>
> (1) indecent, offensively, lewd, [profane], vulgar speech uttered during a school assembly on school grounds; (2) speech during school or at school sponsored events that schools "reasonably regard as promoting illegal drug use; (3) "speech in school-sponsored expressive activities" if the schools' "actions are reasonably related to legitimate pedagogical concerns"; and (4) on-campus and some off-campus speech that "materially disrupts classwork or involves substantial disorder or invasions of the rights of others".

*Kutchinski*, 69 F.4th at 356-57 (citing *Fraser*, 478 U.S. at 683-85; *Morse v. Frederick*, 551 U.S. 393, 408 (2007); *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988); *Tinker*, 393 U.S. at 513; and *Mahonoy Area Sch. Dist. v. B.L. ex rel Levy*, 141 S. Ct. 2038, 2045 (2021)). Only the first category and fourth category are at issue in this case.

Student speech that fits under the fourth category of student speech—i.e. speech that expresses a political viewpoint—is governed by *Tinker v. Des Moines Independent Community School District,* 393 U.S. 503 (1969). In that case, school officials suspended students for wearing black armbands in protest of the Vietnam War. The Supreme Court held that the suppression of the students' political expression could not be validated when the students' behavior did not contribute to a disturbance in the educational environment. *See Tinker*, 393 U.S. at 508. The Court ultimately concluded that when school officials attempt to restrict students from expressing particular political views, they must demonstrate that the prohibition on such speech was necessary

to avoid a material or substantial disruption of the school environment. *Id*. at 511-14.

In contrast, student speech that fits under the first category—i.e. is incident, lewd, profane, vulgar, and objectively offensive—is governed by *Bethel Sch. Dist. No. 403 v. Fraser,* 478 U.S. 675 (1986). *Fraser* involved a student's speech during a high school assembly for student counsel where the student nominated his peer. *Fraser*, 478 U.S. at 677-78. The speech was as follows:

> I know a man who is firm—he's firm in his pants, he's firm in his shirt, his character is firm—but most . . . of all, his belief in you, the students of Bethel, is firm . . . Jeff Kuhlman [the candidate] is a man who takes his point and pounds it in. If necessary, he'll take an issue and nail it to the wall. He doesn't attack things in spurts, he drives hard, pushing and pushing until finally—he succeeds Jeff is a man who will go to the very end—even the climax, for each and everyone of you   So vote for Jeff for A.S.B. vice-president—he'll never come between you and the best our high school can be.

*Fraser*, 478 U.S. at 687 (Brennan, J. concurring). Based on the student's use of "elaborate, graphic and explicit sexual metaphor[s]" throughout the speech, the school suspended Fraser and took him out of the running for graduation speaker. *Id*. at 678.

The Supreme Court acknowledged that while the student's speech contained sexual innuendos rather than express vulgarities and profanities, the speech was still considered lewd, indecent, and plainly offensive given that the audience was high school children. *Id.* at 683-684. The Court explained:

> The schools, as instruments of the state, may determine that the essential lessons of civil mature conduct cannot be conveyed in a school that tolerates lewd, indecent, or offensive speech and conduct such as that indulged in by this confused boy. The pervasive sexual innuendo in Fraser's speech was plainly offensive to both teachers and students—indeed to any mature person. By glorifying male sexuality, and in its verbal content, the speech was acutely insulting to teenage girl students. The speech could well be seriously damaging to its less mature audience, many of whom were only 14 years old and on the threshold of awareness of human sexuality. Some students were reported as bewildered by the speech and the reaction of mimicry it provoked.

*Id.* The Court ultimately held that the school district acted within its authority in disciplining Fraser

for his offensively lewd, vulgar, and indecent speech. *Id.* at 685. The Court further clarified that its decision in *Fraser* was distinguishable from *Tinker* in a very important respect. While the speech in *Fraser* touched on a form of political speech, <u>the imposition of discipline was unrelated to any political viewpoint</u>. *Id.* Instead, the imposition of discipline was due to the speech's lewd, vulgar, profane, and offensive nature, which the Court concluded could be prohibited in school since such speech "would undermine the school's basic educational mission." *Id.* As the Court explained, "[a] high school assembly or classroom is no place for a sexually explicit monologue directed towards unsuspecting audience of teenage students. Accordingly, it was perfectly appropriate for the school to disassociate itself to make the point to pupils that vulgar speech and lewd conduct is wholly inconsistent with the 'fundamental values' of public school education.'" *Id.* at 685-86.

Here, the regulation of "Let's Go Brandon" apparel fits squarely under *Fraser* and not *Tinker*. This is indisputably established by Plaintiffs' own record evidence. Plaintiff tries to paint this as the regulation of political speech—not lewd speech—by arguing "Ferini and Keeple simply felt the school is no place for demonstrations of certain personal opinions." (Doc 8 at 11). But perplexingly, Plaintiffs do not cite to the record to support this assertion, instead, they cite to law—specifically *Tinker*. *Id*. It is unclear why Plaintiffs attempt to support a factual statement with a legal citation. But what is clear is that when looking at the record, Plaintiffs acknowledge this is about vulgar speech, not political speech—that point is conceded in C.C.'s own sworn testimony. (C.C. Affidavit, Doc. No. 1-5) ("Keeple said that Let's Go Brandon' is 'code' for a ***vulgar expression***.") (emphasis added).

And even if the lewd, vulgar, or profane speech can be interpreted to comment on a political issue, then *Tinker* does not apply if the basis for a school's regulation is unrelated to the political

7

viewpoint. The Complaint unambiguously confirms that the phrase means "FUCK JOE BIDEN!" which is clearly profane. (Complaint, at ¶13). There is no evidence that any school administrator intended to regulate Plaintiff's political viewpoints by enforcing the dress code. Thus, *Tinker* does not apply.

      **B.**    **Plaintiff cannot demonstrate a strong likelihood of success on the merits of his Fourteenth Amendment Claim because *Monell* liability cannot be imposed where there is no constitutional violation.**

To establish municipal liability under an "official policy" theory, "a plaintiff must identify the policy, connect the policy to the [school district] itself, and show that the particular injury was incurred because of the execution of that policy." *Wright v. City of Euclid, Ohio*, 962 F.3d 852, 880 (6th Cir. 2020). In other words, there can be no Monell liability without a constitutional violation.

Here, Plaintiff (*very* loosely) claims that the dress code amounts to an illegal official policy. The dress code's prohibition of clothing with a profane message is constitutional on its face under *Fraser*. *See Fraser,* 478 U.S. at 682; *see also Tri Cnty. Area Sch.*, 746 F. Supp 3d at 464. ("In the school setting, profanity does not enjoy First Amendment protection"). Because the part of the dress code Defendants relied upon when disciplining Plaintiff for wearing profane clothing is constitutional, it cannot be used to establish municipal liability against the District. *Wright*, 962 F.3d at 880. Plaintiff's Fourteenth Amendment claim fails as a matter of law and cannot form the basis for relief by a preliminary injunction.

      **C.**    **There is no risk of immediate and irreparable harm to Plaintiff.**

Foremost, because Plaintiff cannot establish a First or Fourteenth Amendment violation occurred, there is no risk of immediate and irreparable harm. *Sumner Cnty. Schs.*, 942 F.3d at 326-27.

Second, as Plaintiff confirms in his Complaint (Doc. 1), exhibits to the Complaint (Docs. 1-1, 1-2, 1-4), and the Application itself (Doc. 8), Defendants have been consistently enforcing the dress code restrictions with Plaintiff since November 2024. *Six months later*, the Court is just now hearing about it because of a field trip to Cedar Point. Each of the disciplinary measures given to Plaintiff by Defendants involved the "Let's go Brandon!" t-shirt. Plaintiff was first put on notice by the school on November 25, 2024, that his t-shirt violated the dress code, and he would face punishment if he wore it again. (Complaint, at ¶¶12, 18-28). Even so, Plaintiff decided the right thing to do was to continue to disrespect his teachers, school administrators, and classmates by wearing the shirt for another five months. As a direct result of *Plaintiff's actions* and decisions, he continued to receive discipline from the school. Five months of disruption and insubordination go by, and he decides it's finally time to get the Court involved due to a field trip.

If Plaintiff felt the harm here was so immediate, he should have sought the Court's intervention back in the fall of 2024 when this first started. His delay cuts directly against any imminency argument and should not go unnoticed.

### C. Granting the Preliminary Injunction would cause substantial harm to the Defendants.

If the Court orders a preliminary injunction on these facts, it will ultimately render the School's code of conduct meaningless. A *preliminary* injunction is meant to be a reversable measure to preserve the status quo between the parties so that the Court may make a meaningful decision after a trial on the merits. *Corbin v. Texaco, Inc.*, 690 F.2d 104, 105 (6th Cir. 1982).

Here, the likelihood of success on the merits of Plaintiff's First and Fourteenth Amendment claims should be the determinative factor. *Sumner Cnty. Schs.*, 942 F.3d at 326-27. Allowing Plaintiff to go on the Cedar Point filed trip rewards six months' worth of defiant and disruptive behavior that – *tshirt aside* – the code of conduct is meant to prevent. If Plaintiff is permitted to

9

go, it sends a clear message to all of the other students who are not attending for the same reason – they have too many disciplinary infractions. Why should Plaintiff be rewarded when the others are left to wonder why they are now singled out? The consequences within the code of conduct need to be applied equally to all.

      **D.**      **The public has no strong interest in this matter.**

Generally, it is always in the public interest to prevent a violation of any constitutional right. *See Gracehaven, Inc. v. Montgomery Cty. Dept. of Job*, S.D.Ohio No. 3:24-cv-325, 2025 U.S. Dist. LEXIS 75356, at *13 (Apr. 21, 2025). But where a party cannot show irreparable harm is imminent, as here, the public interest shifts to maintain the status quo, until the matter can be fully adjudicated. *LeNtz v. Michigan Dept. of Corr.*, E.D.Mich. No. 2:24-cv-10198, 2024 U.S. Dist. LEXIS 137510, at *11 (July 1, 2024). Accordingly, this factor cuts in favor of Defendants and Plaintiffs' application should be denied.

**III.**    **CONCLUSION**

For these reasons, Defendants respectfully ask the Court to DENY Plaintiff's request for injunctive relief.

                                          Respectfully submitted,

                                          ***/s/ Molly E. Davis***
                                          Molly E. Davis (0097484)
                                          Jorden Messmer (0102652)
                                          REMINGER CO., L.P.A.
                                          One SeaGate, Suite 1600
                                          Toledo, Ohio 43604
                                          Telephone: 419-254-1311
                                          Facsimile: 419-243-7830
                                          *medavis@reminger.com*
                                          *jmessmer@reminger.com*

                                          AND

                                          Thomas N. Spyker (0098075)

>REMINGER CO., L.P.A.
>200 Civic Center Drive, Suite 800
>Columbus, Ohio 43215
>(614) 232- 2421
>Fax: (614) 232-2410
>*tspyker@reminger.com*
>
>*Attorneys for the Madison Local School District Defendants*

## CERTIFICATE OF SERVICE

The undersigned counsel certifies that on 11 May, 2025, the foregoing was submitted for e-filing and will be served via the Court's e-filing system. A courtesy copy was sent to Plaintiff's Counsel via email.

>By: */s/ Molly E. Davis*
>Molly E. Davis (0097484)